BROWN, Circuit Judge,
concurring and dissenting:
I agree with the majority that we should affirm the grant of summary judgment for the District of Columbia and that appellate jurisdiction is proper despite defects in the notice of appeal. However, I do not agree with the majority’s view that Derrek Ar-rington’s deposition testimony creates a genuine issue of material fact which precludes summary judgment. Maj. Op. 335-38. The majority acknowledges that Ar-rington’s testimony lacks credibility but concludes it is for the jury to determine its truthfulness. I disagree. This is not testimony about which reasonable minds could differ; this is a confabulation Candide would find suspect.
I
In this case the facts are important; so are the laws of physics. Here both the facts and the physics support the district court’s grant of summary judgment. Based on any remotely reasonable reading of the record, the following is what happened. Arrington was stopped by Park Police for failure to display a front license tag. Arrington presented license, registration, and temporary tags. In the course of that contact, one of the officers, Martin Yates, spotted a clear plastic bag that appeared to contain cocaine residue. Yates’s partner, John Daniels, then asked Arrington to step out of the vehicle. Ar-rington refused. When Daniels reached inside the vehicle to physically extract Ar-rington, Arrington put his car in “drive” and sped off, dragging Daniels seventy-five yards through an intersection. The officer’s contact with the pavement was so violent that his handcuffs left gouge marks in the pavement and were torn from his belt. Mercifully, Daniels finally tumbled free. He picked himself up and hurried back to his police cruiser, in which he and his partner then gave chase.
Fleeing the scene at high speed, Arring-ton lost control during a left turn and crashed into a median. Arrington, a thrice-convicted felon carrying a .380 caliber pistol with a full clip, climbed out of his wrecked car and ran into a residential yard. Daniels and Yates exited their cruiser and pursued on foot. An off-duty police officer, Sergeant Rick Murray, saw the crash and joined the chase. Arrington easily vaulted over two fences but then failed to surmount a third, taller fence. As Arrington tried again to climb the third fence, Officer Daniels caught up with him and pulled him from the fence, and a struggle ensued. Murray, the off-duty officer, joined the melee. Both Murray and Yates reported seeing Arrington push Daniels away with his left hand and then fire a shot point blank into Daniels’s face with his right hand extended. In the light from the muzzle flash, Yates saw the shiny gun. Murray grabbed Arrington’s right arm and wrapped him in a bear hug, and *341 both men fell to the ground. Daniels fell back against the fence. He went down to his knees, tried to rise, and discovered he could not. He remained slumped against the fence.
Not surprisingly, there was much screaming and commotion. Officers and civilian witnesses alike report having heard repeated commands, screams, and curses. “Let go of the gun; let go of the damn gun.”[1] “Drop the fucking gun, get the gun.”[2] “Where’s the gun? Drop the gun.”[3] “He’s too strong. I can’t get the gun away from him.” [4] “Don’t leave me, I don’t have a gun, you gotta come back here, this guy will kill us.”[5] “Get the gun out his hands; get the gun out of his hands.”[6]
Yates had entered that dark yard just in time to see his partner shot. He drew his weapon. Murray and Arrington crashed to the ground, but Arrington was “trying to raise [himself] off the ground, thrusting his hips around and his shoulders.” Murray urged Yates to shoot Arrington. He explained that he was “scared to death[] and ... just knew that if [Arrington] got up, he was going to kill one of us.” Yates placed his gun against Arrington’s head and took up the slack in the trigger mechanism. Whether Arrington heard the gun cock or merely felt the vibration, he stopped moving for a few seconds. His arms remained beneath him, close to his body, very tight. Arrington had stopped moving violently, but he continued to resist. Because Murray and Arrington were entangled, Yates did not shoot and settled for using the side of his weapon to strike Arrington. Yates hit Arrington repeatedly. It was “violent” and “fast,” but he failed to gain Arrington’s compliance. Ar-rington “never went unconscious”; rather, he “fought the whole time,”[7] rolling and moving. Asked why he hit Arrington repeatedly, Yates was clear: “I was determined to put myself in a position where either [Arrington was] going to go unconscious or I was going to have to shoot him.... ” He reasoned that if Arrington was allowed to get to his feet, still armed, ■with a weapon he had already used, “that would just invite him to shoot again.”
Other officers arrived. Officer Kidd joined the fray, using his police baton. Officer Peer, with his police dog Lazer on his lead, repeatedly told Arrington to “give up the gun or I’m going to put the dog on [you].” Arrington did not respond, so the dog was instructed to perform controlled bites of Arrington exposed leg, which it did. Soon after Lazer went to work, Ser *342 geant Murray announced he had the gun. Murray pulled Arrington’s right hand out and stripped the gun from it, tossing it four or five feet away from Arrington. Then, releasing a scream of adrenalin-induced exultation, Murray walked a few paces away. Officer Kidd was able to get control of Arrington’s left arm. Together, he and Yates handcuffed Arrington.
Given the nature of the confrontation — a frantic and desperate struggle in the dark — the sequence of events emerges with remarkable clarity, and the physical evidence — right down to the gouge marks from Officer Daniels’s handcuffs — is completely consistent with the officers’ descriptions of what happened, as well as with radio transmissions that provided virtually a moment-by-moment commentary.
There is but one rip in this seamless web: Arrington’s version of events. According to Arrington, he sped off from the initial traffic stop because the officers had drawn their weapons (or looked like they might). He was also in possession of a gun and knew this violated his parole. Officer Daniels was nowhere near the car, Arrington asserts, and certainly was not being dragged through the streets. Ar-rington claims he was scaling the fence with the gun in his hand in order to dispose of the gun, but that when Daniels pulled him off the fence and then slammed him, face first, back into it, he dropped the gun. Officers then took him down to the ground and handcuffed him. Next, he heard a “pop” sound. When he heard the pop, the gun was already on the ground; Arrington claims he dropped it “way before” he heard the pop. He also saw a flash, and he thought he had been shot. He contends that, as he lay on the ground handcuffed, disarmed, and helpless, the officers pistol-whipped him, beat him with a baton, kicked and punched him, and finally released the dog to attack his leg.
II
The majority identifies one material issue in dispute: “whether, as appellees contend, force was used to subdue appellant while he was armed and before he was in handcuffs, or whether, as appellant contends, he was beaten by police officers after he was captured, restrained, disarmed, and handcuffed.” Maj. Op. 836. The majority insists, with respect to this issue, that the court may not determine credibility, and that therefore Arrington’s sworn testimony that the officers continued to attack him after he was handcuffed, no matter how self-serving and implausible, entitles him to a jury trial. Maj. Op. 338. But the judge’s role in deciding a motion for summary judgment is more robust and flexible than the majority conceives.
To defeat summary judgment, nonmov-ing parties “must do more than simply show that there is some metaphysical doubt as to the material facts,” Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); the party “must offer some hard evidence showing that its version of the events is not wholly fanciful,” D’Amico v. City of New York, 132 F.3d 145, 149 (2d Cir.1998). “The mere existence of a scintilla of evidence in support of the plaintiffs position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.” Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). While it is admittedly not the duty of district courts to weigh the credibility of the parties’ testimony at the summary judgment stage, “in the rare circumstance where the plaintiff relies almost exclusively on his own testimony, much of which is contradictory and incomplete, it will be impossible for a district court to determine whether *343 ‘the jury could reasonably find for the plaintiff,’ and thus whether there are any ‘genuine’ issues of material fact, without making some assessment of the plaintiffs account.” Jeffreys v. City of New York, 426 F.3d 549, 554 (2d Cir.2005) (citation omitted). Therefore, we have held that summary judgment “is most likely when a plaintiffs claim is supported solely by the plaintiffs own self-serving testimony, unsupported by corroborating evidence, and undermined either by other credible evidence, physical impossibility or other persuasive evidence that the plaintiff has deliberately committed perjury.” Johnson v. Wash. Metro. Area Transit Auth., 883 F.2d 125, 128 (D.C.Cir.1989) (emphasis added); see also Laio v. Va. Stage Lines, 444 F.2d 990 (D.C.Cir.1971).
The sequence of events, according to Arrington’s account, began with an officer slamming him into the fence, causing him to drop the gun he was carrying. An officer then forced him to the ground and handcuffed him. Next, he heard a “pop,” after which officers beat him. Finally, he felt the dog “ripping” his leg; “[t]he dog was like tearing my leg up.” No other witnesses corroborated Arrington’s account. Two officers reported seeing the muzzle flash at the end of Arrington’s extended arm. These officers and others described their subsequent efforts to disarm Arrington, who remained unrestrained — descriptions corroborated by contemporaneous radio transmissions and by civilian witnesses who reported a struggle during which police sought to “disarm” or “retrieve something from” Arrington.
Nor does the physical evidence support Arrington’s assertion that the gun somehow fired spontaneously from the ground long after he had dropped it. No tests conducted on the gun were able to cause it to fire without the trigger being pulled. More significantly, Daniels was shot in the face. If Arrington dropped the gun before he was handcuffed, as he claims, and then, after he was handcuffed, the gun fired spontaneously while it was lying on the ground, the bullet could not have turned at a 90 degree angle to strike Daniels in the face. Thus, in order for the jury to rule in Arrington’s favor, it would have to conclude that Arrington’s enchanted gun not only fires of its own volition but also fires magical bullets that can turn somersaults in midair. Bullets behave in this fashion in cartoons; in real life, though, bullets do not start, stop, and change directions. This is a law of physics, not a question of credibility.
Moreover, it is not clear which officer could have handcuffed Arrington at the time he claims he was handcuffed. Officer Daniels did not possess the means to do so. The handcuffs from his duty rig had been torn from his belt when he was dragged by Arrington’s car, and they remained lying in the street. The second set, still in its case, was recovered from Daniels’s personal belongings when he was taken to the hospital. Sergeant Murray, the only other person involved in the initial confrontation, was off duty, wearing sweats, and had no police equipment with him. Other officers did not reach Arring-ton until after Daniels was shot.
There is simply no evidence in the record that corroborates Arrington’s self-serving account. In fact, everything in the record, including the physical evidence and the testimony of several civilian witnesses, contradicts Arrington’s account. When a plaintiff relies entirely on his own self-serving testimony, which lacks any corroboration and is contradicted by all the available physical evidence, a court is not obligated to reward the plaintiff with a jury trial. Johnson, 883 F.2d at 128. Rather, “when the facts alleged are so contradictory that doubt is cast upon their plausibili *344 ty, [the court may] pierce the veil of the complaint’s factual allegations ... and dismiss the claim.” Jeffreys, 426 F.3d at 555 (alterations in original) (internal quotation marks omitted) (quoting Shabazz v. Pico, 994 F.Supp. 460, 470 (S.D.N.Y.1998)). To hold otherwise is to license the mendacious to seek windfalls in the litigation lottery. Under the majority’s rule, a plaintiff can obtain a jury trial simply by testifying to the allegations in his complaint, no matter how implausible they might be. The uncertainty and expense of a jury trial will then frequently lead to nuisance settlements in claims that should be defeated on summary judgment. Arrington’s suit is a case in point. Considering what occurred here, Arrington should be thankful the officers spared his life; instead, he has sued, and the majority thinks his odd and fanciful assertions are persuasive enough to be heard by a jury.
The majority apparently takes the position that if there is any evidence in the record, from any source, from which some tenuous inference can be drawn in favor of the nonmoving party, summary judgment is improper. The import of Anderson, Jef-freys, and Johnson is clearly otherwise. The question is not whether any evidence supports the nonmoving party’s assertions; rather, there must be evidence on which a jury could reasonably find in that party’s favor. Anderson, 477 U.S. at 248-49, 106 S.Ct. 2505; Jeffreys, 426 F.3d at 554; Johnson, 883 F.2d at 128. “The inquiry performed is the threshold inquiry of determining whether there is the need for a trial- — -whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party. ” Anderson, 477 U.S. at 250, 106 S.Ct. 2505 (emphasis added). Therefore:
[Judges are no] longer required to submit a question to a jury merely because some evidence has been introduced by the party having the burden of proof.... [The question is] not whether there is literally no evidence [supporting the nonmoving party], but whether there is any upon which a jury could properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed.
Id. at 251, 106 S.Ct. 2505 (internal quotation marks omitted) (quoting Improvement Co. v. Munson, 81 U.S. (14 Wall.) 442, 448, 20 L.Ed. 867 (1872)).
The majority relies on Greene v. Dalton, 164 F.3d 671 (D.C.Cir.1999), for the proposition that summary judgment is improper if the parties’ sworn statements are in material conflict. I read Greene, however, as staking out a more limited ground: that a court may not grant a motion for summary judgment when reasonable minds could differ as to the import of the evidence. The sexual harassment allegations in Greene were claims which a reasonable jury could have resolved either way — a quintessential jury question. Here, by contrast, only a runaway jury could return a verdict for Arrington based on his testimony as to what occurred, and if a jury did return such a verdict, appellees would be entitled to a directed verdict. Because I agree with the trial court that appellees are entitled to prevail on summary judgment, I respectfully dissent.

. Civilian witness Runako Ellerby, resident of a back apartment on 13th Street, NW. Mr. Ellerby said the officers surrounded the suspect after he "heard the gun go off.” He could see several police officers "struggling with [Arrington] trying to disarm him.” They said, "Let it go drop the damn gun,” as they "repeatedly attempted] to get him to release the weapon.” Sergeant Moser, summarizing the debriefing statements of Yates and Murray, recalled the same words.

. Officer Daniels's recollection of what he heard as he lay slumped against the fence.

. Civilian witness Louis Price, resident at 1223 Missouri Ave., NW # 4. He was awakened by voices outside his window and then heard a "pop” sound. He looked out and saw what he thought was a police officer struggling with a man on the ground. The officers appeared to be trying to retrieve something from the man.

. Officer Yates's recollection of what Murray said. According to Yates, Murray was excited and yelling.

. Sergeant Murray's plea to Officer Yates.

. Civilian witness Tiyon Smith, who reports hearing the police say this immediately after he heard a single gunshot.

. Murray's Dep. 37:4-5, Nov. 4, 2004.